UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JULENE VALENTINE, Plaintiff, | : | CIVIL CASE NO. 17-CV-2275 |
| | : | FIRST AMENDED COMPLAINT |
| -against- | : | PLAINTIFF REQUESTS A TRIAL BY JURY |
| BRAIN & SPINE SURGEONS OF NEW YORK, P.C., SCOLIOSIS AND SPINE SURGERY P.C., KRISHNA SHARMA AND RUDOLPH TADDONIO, BOTH INDIVIDUALLY AS AIDERS AND ABETTORS Defendant(s). | : | |

Plaintiff, Julene Valentine, by her attorney Brendan Chao, for her First Amended Complaint against defendants, Brain & Spine Surgeons of New York, P.C., ("BSSNY"), Scoliosis and Spine Surgery ("SSSX"), Krishn Sharma ("Sharma") and Rudolph Taddonio ("Taddonio"), both individually as aiders and abettors alleges as follows:

## THE NATURE OF THE ACTION

1. This is a civil action for damages and remedies brought under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 et seq.; and the New York State Executive Law, as amended, § 290 et seq. ("New York State Human Rights Law").

2. Specifically, defendants discriminated against Ms. Valentine and terminated her employment because of a perceived disability.

## THE PARTIES

2. Plaintiff Julene Valentine ("Plaintiff" or "Ms. Valentine") was employed by defendants for approximately twenty nine (29) years from May 4, 1987 to March 3, 2016,

when defendants fired her; Plaintiff resides in White Plains, New York.

3. At all relevant times herein, plaintiff was an "employee" of defendants within the meaning of the applicable statutes.

4. At all relevant times herein, the corporate defendants were an "employer" within the meaning of the applicable statutes, and together they employed more than fifteen employees.

5. The corporate defendants' principal executive offices are located at 244 Westchester Ave., Suite 310, White Plains, N.Y. 10604.

6. Prior to the merger, BSSNY was made up of a team of neurosurgeons who specialized in brain and spine surgery.

7. Prior to the merger, SSSX was comprised of two surgeons, defendants Sharma and Taddonio, who specialized in spine surgery.

8. At all relevant times, both corporate defendants merged to form one medical practice.

9. Alternatively, at all relevant times, both corporate defendants were operated as a single, integrated enterprise and single employer, or as a joint employer, and together employed more than fifteen (15) employees.

10. Defendant BSSNY maintained centralized control over the interrelated surgical operations of both corporate defendants.

11. Defendants BSSNY and SSSX shared common ownership and financial control, as well as common management and control over labor relations and personnel policies and practices, including the hiring and firing of employees.

12. The individual defendants are medical surgeons engaged in the business of spine surgery, and upon information and belief, are residents of New York State.

13. Both individual defendants are principals of the corporate defendants, and aided and abetted the acts alleged herein.

14. The decision to merge the medical practices of defendants BSSNY and SSSX, including the decision to hire and fire employees of defendant SSSX, was made by the individual defendants, and relevant principals of BSSNY.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action under 28 U.S.C. § 1331, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

16. Ms. Valentine filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 13, 2016, naming all the defendants herein as Respondents.

17. Ms. Valentine received a Dismissal and Notice of Rights against all defendants herein from the EEOC. See Exhibit 1 annexed hereto.

18. Less than ninety days have elapsed between the filing of the original complaint, and her receipt of a Right to Sue Letter from the EEOC.

19. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to plaintiff's claims occurred in the Southern District of New York.

FACTS

20. Ms. Valentine worked twenty-nine (29) years for defendants; she began her employment with SSSX on May 4, 1987, and her employment with defendants ended on March 3, 2016.

21. Ms. Valentine was hired by Defendants SSSX and Taddonio as a medical transcriptionist.

22. As time went on, Ms. Valentine was given more responsibilities such as inputting insurance and patient payments into a database and performing all end-of-month reports.

23. Ms. Valentine's was sent to a course in Pittsburgh, PA to learn more about the hardware/software they were using at the office, and she shared this new information with her co-workers.

24. Ms. Valentine's duties and responsibilities included, among other things, answering phones, entering insurance and patient payments in the computer, performing all end-of-the-month reports, training in medical computer software, and teaching other office employees new computer software.

25. In or about 1989, Ms. Valentine was promoted to surgical coder and biller; this was the top clerical position at the defendants' office.

26. Her job duties as surgical coder and biller included, among other things, doing the banking, paying office invoices, sending surgical claims to insurance companies, negotiating with insurance companies, booking surgical procedures, and transcriptionist duties.

27. Ms. Valentine also completed the yearly Morbidity and Mortality clinical study for the Scoliosis Research Society. In addition, plaintiff was sent to seminars relevant to the defendants' business.

28. Ms. Valentine was also responsible for opening and running the Stamford, CT office every Thursday for approximately 15 years.

29. Ms. Valentine organized office moves, transported files from the New York office, provided Excel sheets and submitted reimbursements, and billed claims for a class action lawsuit.

30. Throughout the course of her employment with defendants, Ms. Valentine was an excellent employee, was given substantial responsibility, and always performed her duties in a diligent, thorough, professional, and competent manner.

31. In or about 2013, Ms. Valentine was promoted to Practice Manager.

32. Her job duties and responsibilities as Practice Manager included, all of her other previously mentioned duties, in addition to setting up the physicians' schedules, making sure their vacations dates, office hours, and seminars were planned so as not to interfere with patient surgeries, planning out the monthly schedule of the radiology technologist, and making sure employee days off and vacations did not overlap so that there were enough staff to perform patient office hours.

33. In or about November 2015, the individual defendants, Drs. Taddonio and Sharma informed Ms. Valentine that the practice was "merging" with Brain and Spine Surgeons of NY ("BSSNY").

34. Following the merger, the combined employee headcount of the two corporate defendants exceeded fifteen (15) employees.

35. The two medical practices, SSSX and BSSNY, began overlapping medical operations, i.e. brain and spine surgery.

36. Following the merger, SSSX's practice operated under BSSNY's Federal Tax ID Number, SSSX's practice would use BSSNY's office software program, all insurance payments and patient payments to SSSX would be inputted by BSSNY employees, and BSSNY would provide the necessary Explanation of Benefits for SSSX's patients' review, and appeal, if necessary.

37. The two corporate defendants shared employees, services, records, and equipment.

38. BSSNY was involved directly in SSSX's daily business decisions relating to maintaining patient files, treatment of patients, and finances, i.e. accounts receivable.

39. After learning about the merger, Ms. Valentine met with BSSNY's Business Manager, Denise Lewis ("Ms. Lewis"), to discuss, among other things, how SSSX billed claims, insurance networks, and the various roles of SSSX employees.

40. Ms. Valentine was informed by Ms. Lewis that SSSX would immediately begin submitting office and surgical claims under the BSSNY Federal Tax ID number, and the information would be submitted by BSSNY employees.

41. Ms. Valentine received emails from a BSSNY administrator, Ken Tompkins, regarding x-ray reimbursements, so that he could decide whether to buy a new digital x-ray machine, or continue to use the one in the SSSX office.

42. BSSNY had actual control over the labor relations with SSSX.

43. Defendant BSSNY's office manager implemented personnel decisions that directly affected SSSX employees when he began to reduce the hours of several SSSX employees.

44. BSSNY was making employment decisions unilaterally at this point, as the affected employees reported the reduced hours to defendant Taddonio, who said he would speak to someone at BSSNY.

45. Both corporate defendants were operationally interrelated and interdependent upon one another, including but not limited to the use by BSSNY of SSSX's medical equipment, and SSSX's use of BSSNY's employees for certain administrative tasks.

46. In the Fall of 2015, Ms. Valentine began to suffer from constant tiredness, lack of appetite, skin discoloration, trouble walking, shortness of breath, and dizziness.

47. In or about November 2015, Sandy Solotaroff ("Ms. Solotaroff"), a co-worker, informed Dr. Taddonio about Ms. Valentine's ongoing symptoms.

48. Dr. Taddonio replied to Ms. Solotaroff that "She's fine."

49. In or about December 2015, Ms. Solotaroff again told Dr. Taddonio that Ms. Valentine did not look well.

50. Dr. Taddonio informed Ms. Valentine's co-workers that he would make sure she "goes to a doctor for a work up," and that he would speak to her husband.

51. Dr. Taddonio did not approach Ms. Valentine or her husband regarding her medical condition at this time.

52. At or about this same time, Ms. Valentine continued to work 10-12 hours a day.

53. Ms. Valentine's co-workers again informed her that she did not look well; she had lost approximately seventy-five pounds, and her symptoms began to worsen.

54. By February 2016 her legs and thighs were swollen to the point that she could barely bend her legs and could only walk 8-10 steps at a time.

55. On or about February 19, 2016, Ms. Valentine met with Dr. Aris Comninellis ("Dr. Comninellis") at Westmed Medical Group.

56. Dr. Comninellis ran a series of tests, e.g. a complete blood count and urinalysis.

57. Dr. Comninellis diagnosed Ms. Valentine with "life threatening anemia," and told her she needed to go to the Emergency Room ("ER") at White Plains Hospital by ambulance.

58. Anemia is a disorder that develops when there is not enough hemoglobin (red blood cells) in an individual's body. Hemoglobin are the cells that carry oxygen. If the hemoglobin is low or abnormal the body cannot get enough oxygen.

59. Dr. Comninellis informed Ms. Valentine that her hemoglobin was 3.8; a normal hemoglobin level for a female is between 11 and 15.

60. On or about February 19, 2016, through February 21, 2016, Ms. Valentine was hospitalized at White Plains Hospital and received six units of packed red cells, and an IV of iron.

61. During her hospital stay, defendant Sharma visited Ms. Valentine, and they spoke about her condition, the treatment she received, and how she felt.

62. On or about February 21, 2016, the day of Ms. Valentine's discharge, a Westmed hospital physician informed her that her hemoglobin was 9, and that she either had an iron deficiency due to non-absorption of iron, or was bleeding internally.

63. On or about February 22, 2016, Dr. Comninellis informed Ms. Valentine that she should not work until at least Monday, February 29, 2016.

64. On or about February 29, 2016, Ms. Valentine returned to work and worked the whole day.

65. On or about the same day, Ms. Valentine informed Dr. Taddonio that she would have to miss work for a scheduled colonoscopy and endoscopy.

66. On or about March 3, 2016, Ms. Valentine's employment with defendants was terminated.

67. Ms. Valentine was informed of her termination through a phone call from Drs. Taddonio and Sharma who stated that "It was a sad day."

68. Dr. Taddonio informed Ms. Valentine's co-workers, Ms. Solotaroff and Nanette Digiralomo that the reason he was letting Ms. Valentine go was because he felt she was "not doing her job up to her capability because she was ill."

69. Dr. Taddonio also told both Ms. Solotaroff and Nanette Digiralomo that he thought Ms. Valentine may have a "neurological problem."

70. These statements made by defendant Taddonio were then relayed to Ms. Valentine.

**FIRST CAUSE OF ACTION**
**(Disability Discrimination Under the ADA - Failure to Accommodate as to Corporate Defendants Only)**

71. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 70 as if separately set forth herein.

72. At all relevant times, plaintiff was an "employee" of defendants under the ADA, 42 U.S.C. § 12111(4).

73. Defendants are "employers" under the ADA, 42 U.S.C. § 12111(5).

74. Plaintiff is, and has been at all relevant times; a qualified individual with a disability and a record of a disability within the meaning of the ADA or, in the alternative, defendants regarded or perceived plaintiff as suffering from a physical or mental impairment that rendered her disabled within the meaning of the ADA.

75. Plaintiff is, and has been at all relevant times, otherwise qualified for the position she held at SSSX and BSSNY; she was, and is, able to perform the essential functions of that position with reasonable accommodation, i.e. taking time off to undergo medical testing and other necessary medical procedures.

76. Plaintiff also has a record of the illnesses described in the preceding paragraphs, and defendants perceived plaintiff as disabled.

77. Defendants were aware of plaintiff's medical condition, and her medical need to undergo future medical treatment for, among other things, a colonoscopy and endoscopy.

78. Plaintiff was, and is, able to perform the essential functions of her position with reasonable accommodation.

79. Defendants failed to accommodate plaintiff's medical condition by terminating her employment three days after she returned to work.

80. Since defendants engaged in their discriminatory practices with malice or with reckless disregard for plaintiff's federally protected rights, plaintiff also requests an award of punitive damages, in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**
**(Disability Discrimination Under the ADA - Discriminatory Termination as to Corporate Defendants Only)**

81. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 80 as if separately set forth herein.

82. At all relevant times, plaintiff was an "employee" of defendants under the ADA, 42 U.S.C. § 12111(4).

83. Defendants are "employers" under the ADA, 42 U.S.C. § 12111(5).

84. Plaintiff is, and has been at all relevant times; a qualified individual with a disability and a record of a disability within the meaning of the ADA or, in the alternative, defendants regarded or perceived plaintiff as suffering from a physical or mental impairment that rendered her disabled within the meaning of the ADA.

85. Plaintiff is, and has been at all relevant times, otherwise qualified for the position she held at SSSX and BSSNY.

86. Plaintiff also has a record of the illnesses described in the preceding paragraphs, and defendants perceived plaintiff as disabled.

87. Defendants terminated plaintiff's employment because of her perceived disability in violation of the ADA when defendant Taddonio stated to plaintiff's coworkers that her employment was terminated because she was ill.

88. Any subsequent reason(s) given by defendants for terminating plaintiff's employment are either a pretext for, or an admission of disability discrimination.

89. As a result of defendants' discrimination, plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

90. Since defendants engaged in their discriminatory practices with malice or with reckless disregard for Plaintiff's federally protected rights, Plaintiff also requests an award of punitive damages, in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**(Disability Discrimination Under the New York State Human Rights Law — Failure to Accommodate)**

91. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 90 as if separately set forth herein.

92. At all relevant times, plaintiff was an "employee" of defendants for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

93. Defendants are "employers" for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

94. At all relevant times, plaintiff was an individual with a disability or an individual perceived or regarded as being disabled within the meaning of the New York State Human Rights Law, and her disability led to the termination of her employment.

95. Plaintiff also has a record of the illnesses described in the preceding paragraphs, and defendants perceived plaintiff as disabled.

96. Defendants were aware of plaintiff's medical condition, and her medical need to undergo future medical treatment for, among other things, a colonoscopy and endoscopy.

97. Plaintiff was, and is, able to perform the essential functions of her position with reasonable accommodation.

98. Defendants failed to accommodate plaintiff's medical condition by terminating her employment three days after she returned to work.

**FOURTH CAUSE OF ACTION**
**(Disability Discrimination Under the New York State Human Rights Law — Discriminatory Termination)**

99. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 98 as if separately set forth herein.

100. At all relevant times, plaintiff was an "employee" of defendants for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

101. Defendants are "employers" for purposes of §§ 292 and 296, as well as all other relevant sections of the New York State Human Rights Law.

102. At all relevant times, plaintiff was an individual with a disability or an individual perceived or regarded as being disabled within the meaning of the New York State Human Rights Law, and her disability led to the termination of her employment.

103. Plaintiff also has a record of the illnesses described in the preceding paragraphs.

104. By terminating plaintiff's employment, defendants discriminated against her because of his disability, in violation of the New York State Human Rights Law, § 296(1).

105. As a result of this discrimination, plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

WHEREFORE, while reserving the right to seek additional damages as available, plaintiffs demand judgment against defendant as follows:

A. On the First and Second Causes of Action, back pay and benefits and front pay and benefits, plus compensatory and punitive damages, all in amounts to be determined at trial, as well as attorneys' fees, costs and interest;

B. On the Third and Fourth Causes of Action, back pay and benefits and front pay and benefits, plus compensatory damages, all in amounts to be determined at trial, as well as costs and interest;

C. Such other and further relief as this Court deems just and proper.

Dated: June 9, 2017
Rockville Centre, N.Y.

BRENDAN CHAO
Attorney & Counsellor at Law

By: ______________________
Brendan Chao

Attorney for Plaintiff
50 Merrick Road
Rockville Center, N.Y. 11570
(516) 466-2033

TO: Peter N. Freiburg, Esq. **VIA ECF**
DENLEA & CARTON LLP
Attorneys for Defendants
2 Westchester Park Drive, Suite 410
White Plains, N.Y. 10604